# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

**CIVIL ACTION NO. 1:16-cv-830 (WOB-SKB)**

**MEDPACE, INC.**                                                                 **PLAINTIFF**

**VS.**                                    **MEMORANDUM OPINION AND ORDER**

**INSPIREMD, INC.**                                                          **DEFENDANT**

This case arises from allegations that Defendant InspireMD breached its contract with Medpace to pay for the clinical trial services that Medpace provided pursuant to a Master Services Agreement and Task Order. The Complaint sets forth the following three counts:

**Count I:**        **Breach of Contract** – Medpace alleges it performed under the contract and seeks to recover four unpaid quarterly payments and pass-through costs, as wells as interest. (Doc. 20, ¶¶ 21–28).

**Count II:**       **Unjust Enrichment** – In the alternative, if a contract is not found to exist between the parties, Medpace seeks compensation for the detriment incurred by providing benefits that InspireMD knowingly retained. (Doc. 20, ¶¶ 39–43).

**Count III:**      **Promissory Estoppel** – Likewise, if a contract is not found to exist, Medpace seeks to recover damages under the theory of promissory estoppel. (Doc. 20, ¶¶ 44–47).

*Medpace, Inc. v. InspireMD, Inc.*

Plaintiff seeks total damages in excess of $1,964,922, plus interest, costs, attorneys' fees, and expenses. (Doc. 20, at 8).

This matter is now before the Court on (1) Defendant InspireMD's motion for summary judgment (Doc. 35); (2) Plaintiff Medpace's motion to "deny Defendant InspireMD, Ltd's motion for summary judgment . . . , or in the alternative, to defer considering defendant's motion" until further discovery is complete (Doc. 44); and (3) Medpace's motion to strike the declaration of InspireMD's counsel, Jonathan Pressment (Doc. 45).

The Court previously heard oral argument on these motions and took the matter under submission. (Doc. 61). At that hearing, the parties' requested that the Court state its view of the legal issues herein, prior to ruling on the pending motions, so that the parties could participate in mediation with the benefit of the Court's opinion. After further study, the Court now issues the requested opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Overview of the Contract Between the Parties

On May 21, 2013, Plaintiff Medpace, Inc. and Defendant InspireMD, Ltd. entered into a contract, the Master Services Agreement ("MSA"). (Doc. 20-1 at 1). Under the MSA, Medpace agreed to conduct clinical trials for InspireMD's new MGaurd Prime Stent System (the "Stent"), and InspireMD agreed to pay for the services. (Doc. 20, ¶ 11–12); (Doc. 20-1 at 1, 3). In addition, the MSA provided that a Task Order would establish the precise services to be performed and payments to be made. (Doc. 20-1 at 1). In the event of a conflict between the terms of the MSA and the Task Order, the MSA would control unless the Task Order stated

*Medpace, Inc. v. InspireMD, Inc.*

otherwise. *Id.* at 15. The Task Order was eventually executed on June 12, 2013, and set forth the: (1) "Scope of Work," (2) "Project Schedule," (3) "Project Budget," and (4) "Payment Schedule." *Id.* at 16. The material terms of the MSA and the Task Order are as follows.

Pursuant to the MSA, InspireMD agreed to: (i) pay Medpace "fixed" Service Fees (or Direct Fees); (ii) "reimburse" Medpace for "reasonable pass-through costs identified in the Task Order"; and (iii) pay for "Pre-funded Expenses" in the "Task Order's project budget" in order to facilitate "timely payment of such funds to Pre-funded Vendors." (Doc. 20-1 at 3–4, 16, 26–27). As to the payment amount, InspireMD agreed to pay Medpace "an amount equal to the Project Budget . . ., which amount shall be payable pursuant to the Payment Schedule." *Id.* at 16; *see also id.* at 3. The Project Budget specifically establishes:

**Total Service Fees (Direct Fees) of $3,347,035; and**

**Total Pass-Through Costs of $292,941.**

*Id.* at 16, 27–28. The total amount of Service Fees is divided in the Payment Schedule into twenty-one (21) payments that correspond to individual milestones. *Id.* at 28. In relevant part, the Payment Schedule sets forth a series of ten quarterly payments. *Id.* There are an additional eight payments that are connected to individual milestones for the number of patients Medpace enrolls or completes, with a total of 445 clinical trials to be completed. *Id.* at 28. In other words, these eight additional payments are contingent upon patient enrollment and completion, similar to a "bonus" for exceptional progress with the clinical trials.

Both the MSA and the Task Order prescribe that the "Service Fees" or "Direct Fees"

*Medpace, Inc. v. InspireMD, Inc.*

are "**fixed costs** unless the underlying assumptions change, including but not limited to, trial duration, number of investigative sites, number of patients, and services provided by Medpace." *Id.* at 3, 16, 30 (emphasis added).

Any changes to the Task Order, the Project Budge, Payment Schedule, Project Schedule or the underlying assumptions required a written contract amendment—signed by both parties—"detail[ing] the requested changes to the applicable task, responsibility, duty, budget, timeline or other matter." *Id.* at 3.

In terms of terminating *the MSA*, either party could do so "without cause" by providing the other party sixty days' written notice. *Id.* at 7.

*InspireMD* could terminate *the Task Order* "without cause" by providing sixty (60) days' written notice. *Id.* at 7, 8. *Medpace*, on the other hand, could terminate *the Task Order* "only if" InspireMD "defaulted on its obligations." *Id.* In that case, the MSA requires Medpace to give InspireMD written notice of default and an opportunity to cure the breach before terminating the Task Order. *Id.* The MSA provides that any notice (*e.g.*, termination) is required to be in writing and is "effective upon receipt" by August J. Troendle, Medpace's President and CEO in Cincinnati, Ohio (if to Medpace) and "effective upon receipt" by Craig Shore in Tel Aviv, Israel (if to InspireMD). *Id.* at 8.

In the event that the Task Order is terminated before completion, Medpace is obligated to submit an itemized accounting of the services performed, expenses incurred, and payments received to determine the balance due. *Id*. InspireMD, in turn, must "pay [Medpace] for all Services rendered pursuant to the unfinished Task Order prior to such

termination and any non-cancelable expenses incurred in connection with [Medpace]'s performance of Services thereunder." *Id.* at 7.

### B. The Contract is Terminated

On September 23, 2014, Jen Folley, InspireMD's outside consultant and project manager, sent a letter to Deborah Schmalz, Medpace's Senior Director of Regulatory Affairs. (Doc. 26-4 at 2). The letter was a "follow-up" to a prior conversation. *Id.* In the letter, Folley asked that certain activities related to the clinical trials be kept "to a minimum" and other tasks "should be ceased or halted." *Id.* The letter also included a table listing those tasks InspireMD wished to "freeze" and those tasks that should be performed on an "[a]s needed" basis. *Id.* Nowhere in this letter does it mention that InspireMD intended to terminate the Task Order or the MSA. Approximately two months later, InspireMD then made its sixth quarterly payment to Medpace, which was not due until November 30, 2014. (Doc. 35-1 at 7; Doc. 26, ¶ 71; Doc. 20, ¶ 25).

Nearly a year later, on November 24, 2015, (roughly six days before the tenth and final quarterly payment was due) Medpace sent a Notice of Termination of the Task Order and the MSA ("Notice of Termination") to InspireMD's Craig Shore. (Doc. 20-2 at 1). In the Notice of Termination, Medpace stated that InspireMD had failed to make four previous quarterly payments (quarterly payments 7–10) or cure these breaches. (Doc. 20, ¶¶ 24–25, 29). Medpace included with its Notice of Termination an itemized accounting of the services performed, expenses incurred, and outstanding invoices up to that point, (Doc. 20-2 at 1), and requested that InspireMD remit payment for the total itemized amount of $1,964,922.

*Medpace, Inc. v. InspireMD, Inc.*

*Id.* This suit followed when InspireMD refused to pay.

### C.    Procedural History

Since this lawsuit was removed from state court on August 10, 2016, Medpace has twice amended its complaint. (Docs. 7, 20).[1] Roughly two months into discovery, InspireMD moved for summary judgment. (Doc. 35). A week later, InspireMD sought an order staying all discovery pending the resolution of its motion for summary judgment. (Doc. 37). In granting the stay on discovery on March 9, 2018, the magistrate judge viewed Medpace's argument that it needed discovery as "cursory and unpersuasive" because the "motion seeks to resolve, as a matter of law, the two parties' differing constructions or interpretations of the same contractual language." (Doc. 41 at 3).

### ANALYSIS

## I.    Unjust Enrichment and Promissory Estoppel (Counts II & III)

### A.    Applicable Law

"When interpreting contracts in a diversity action," courts should "generally enforce the parties' contractual choice of governing law." *See, e.g., Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 596 (1991); *see also Tele-Save Merchandising Co. v. Consumers Distrib. Co., Ltd.*, 814 F.2d 1120,

---

[1] In answering Medpace's Second Amended Complaint, InspireMD asserted four counterclaims for (i) breach of contract; (ii) fraud in the inducement; (iii) negligent misrepresentation; and (iv) violation of the Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.03(A)(2). (Doc. 26 at 26–29). InspireMD has not moved for summary judgment as to these claims.

*Medpace, Inc. v. InspireMD, Inc.*

1122 (6th Cir. 1987) ("Ohio choice-of-law principles strongly favor upholding the chosen law of the contracting parties."). The MSA's choice-of-law clause explicitly provides that the performance, interpretation, and construction of the MSA is controlled by Ohio law. (Doc. 20-1 at 14). As the parties do not dispute that the MSA and Task Order at issue are governed by Ohio law, the Court will apply Ohio law to the parties' contractual dispute.

### B.     Counts II & III are Not Viable Because a Valid Contract Exists.

Under Ohio law, the essential elements of an enforceable contract include "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Williams v. Ormsby*, 966 N.E.2d 255 at 258 (Ohio 2012) (quoting *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002)). The Court agrees with the parties that the MSA and the Task Order satisfy these requirements, and therefore are "valid and enforceable contracts." (Doc. 20, Compl. ¶ 11); (Doc. 26, Answer, ¶¶ 40, 45). In fact, the parties' contract is fully integrated. (Doc. 20-1 at 13) ("This Agreement contains the full understanding of the parties").

Medpace, therefore, cannot proceed on its claims for unjust enrichment and promissory estoppel under Counts II and III. This result is unavoidable because it is well established that "[u]njust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates *in the absence of an express contract or a contract implied in fact*." *Wuliger v. Mfrs. Life Ins. Co. (USA)*, 567 F.3d 787, 799 (6th Cir. 2009) (emphasis in original) (quoting *Beatley v. Beatley*, 828 N.E.2d 180, 192–93 (Ohio Ct. App. 2005). As such, "Ohio law is clear that a plaintiff may not recover under the theory of unjust enrichment or

*Medpace, Inc. v. InspireMD, Inc.*

quasi-contract when an express contract covers the same subject." *Id.* (quoting *Lehmkuhl v. ECR Corp.*, No. 06 CA 039, 2008 WL 5104747, at *5 (Ohio Ct. App. Dec. 2, 2008). The same is true regarding a claim for promissory estoppel. *O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 583 (6th Cir. 2007) (citations omitted) ("Where the parties have an enforceable contract . . . one party cannot recover for promissory estoppel.").

Therefore, since a contract governs the parties' dispute, Medpace cannot recover under its alternative theories of equitable relief. *Coma Ins. Agency v. Safeco Ins. Co.*, 526 F. App'x 465, 469 (6th Cir. 2013); *Wuliger*, 567 F.3d at 799; *O'Neill*, 497 F.3d at 583.

## II. Breach of Contract (Count I)

The elements of a breach of contract claim under Ohio law are: "(1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012); *Jarupan v. Hanna*, 878 N.E.2d 66, 73 (Ohio Ct. App. 2007). As noted above, the first element is satisfied. The only element that is somewhat in dispute is whether Medpace performed as required. (Doc. 26, ¶ 42). Indeed, InspireMD admits that it did not pay Medpace for quarterly payments 7–10, and instead merely contends Medpace was not entitled to these payments under the terms of the MSA and Task Order. (Doc. 26, ¶¶ 25, 32); *cf.* (Doc. 20, ¶ 25). Thus, the Court must determine the parties' rights and duties under the MSA and Task Order, as applied to the undisputed facts in the record.

### A. Principles of Contract Interpretation

The "interpretation of written contract terms, including the determination of whether

*Medpace, Inc. v. InspireMD, Inc.*

those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (applying Ohio law). "When confronted with an issue of contract interpretation, [the court's] role is to give effect to the intent of the parties." *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011). "[T]hat intent is presumed to reside in the language [the parties] chose to employ in the agreement." *State ex rel. Petro v. R.J. Reynolds Tobacco Co.*, 820 N.E.2d 910, 915 (Ohio 2004); *Sunoco, Inc.* 953 N.E.2d at 292. "Where a contract is found to be integrated, courts consider the language of the contract alone to define the obligations by which the parties intended to be bound." *Dottore v. Huntington Nat'l Bank*, 480 F. App'x 351, 352 (6th Cir. 2012) (citing *Bellman v. Am. Int'l Grp.*, 865 N.E.2d 853, 856–57 (Ohio 2007)).

"[T]he meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible." *Savedoff*, 524 F.3d at 763 (quoting *Burris v. Grange Mut. Co.*, 545 N.E.2d 83, 88 (Ohio 1989)). This includes "writings executed as part of the same transaction." *Textileather Corp. v. GenCorp Inc.*, 697 F.3d 378, 382 (6th Cir. 2012) (citation and internal quotations omitted). "Common, undefined words appearing in a contract will be given their ordinary meaning . . ." *Sunoco, Inc.*, 953 N.E.2d at 292. But courts do not give words their ordinary meaning if "manifest absurdity results," *id.*, or "'some other meaning is clearly evidenced from the face or overall contents of the agreement.'" *Lockheed Martin Corp. v. Goodyear Tire & Rubber Co.*, 529 F. App'x 700, 703 (6th Cir. 2013) (quoting *Sunoco, Inc.*, 953 N.E.2d at 293).

*Medpace, Inc. v. InspireMD, Inc.*

9

"Only if the contract is ambiguous will courts look to facts outside the four corners of the contract to determine intent." *Yellowbook Inc. v. Brandeberry*, 708 F.3d 837, 844 (6th Cir. 2013). Otherwise, courts "must apply the plain language of the contract." *Textileather Corp. v. GenCorp Inc.*, 697 F.3d 378, 382 (6th Cir. 2012) (quoting *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997)); *City of St. Marys v. Auglaize Cty. Bd. of Comm'rs*, 875 N.E.2d 561, 566 (Ohio 2007) ("Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract."). "If a contract, or, term in a contract . . . is ambiguous" then "extrinsic evidence of reasonableness or intent can be employed." *Cal. Fitness I, Inc. v. Lifestyle Family Fitness, Inc.*, 433 F. App'x 329, 337 (6th Cir. 2011) (citation and internal quotations omitted). This so-called "parole evidence," however, "is admissible to interpret, but not to contradict, the express language of the contract." *United States v. Ohio*, 787 F.3d 350, 354 (6th Cir. 2015) (citations and internal quotations omitted).

"Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Savedoff*, 524 F.3d at 763 (citation and internal quotation marks omitted); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 361 (6th Cir. 2014). "**[C]ourts may not use extrinsic evidence to create an ambiguity**; rather, the ambiguity must be patent, i.e., apparent on the face of the contract." *Savedoff*, 524 F.3d at 763 (emphasis added) (quoting *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003)).

 On the other hand, "**a contract is unambiguous** if it can be given a definite *legal*

*meaning.'" LM Ins. Corp. v. Criss*, 716 F. App'x 530, 534 (6th Cir. 2017) (emphasis added) (quoting *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003)). "A contractual term is not ambiguous merely because"—as in this case—"two parties offer substantially different interpretations." *Coma Ins. Agency v. Safeco Ins. Co.*, 526 F. App'x 465, 468 (6th Cir. 2013) (citation and internal quotation marks omitted). In the same vein, "[t]he fact that a contract . . . is silent on a particular point does not make it ambiguous." *Savedoff*, 524 F.3d at 764 (quoting *Statler Arms v. Apoca, Inc.*, 700 N.E.2d 415, 421 (Ohio Ct. App. 1997)).

 "If a contract is clear and unambiguous . . . there is no issue of fact to be determined," *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 684 (6th Cir. 2000) (quoting *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio*, 474 N.E.2d 271, 272–73 (Ohio 1984)),[2] and "a court may look no further than the writing itself to find the intent of the parties." *Sunoco, Inc.*, 953 N.E.2d at 292.

## B.    InspireMD's Payment Obligations

The parties' dispute here turns on InspireMD's payment obligations under the MSA. With the above principles of interpretation in mind, the Court turns to the language governing payments in the MSA and Task Order.

Section (6)(E) of the MSA provides that: "In the event of any termination of a Task Order before completion," InspireMD must pay Medpace for: "[1] all services rendered

---

[2] "[I]f a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term." *Bank One, N.A. v. Echo Acceptance Corp.*, 380 F. App'x 513, 521 (6th Cir. 2010) (quoting *Inland Refuse Transfer Co.*, 474 N.E.2d at 272–73).

pursuant to the unfinished Task Order *prior to such termination and* [2] *any non-cancelable expenses incurred* in connection with MEDPACE's performance of Services." (Doc. 20-1 at 7) (emphasis added).

The parties dispute when the contractual relationship ended. Inspire MD contends it terminated the Task Order by virtue of a letter sent in September of 2014, and therefore it is not obligated to pay for services beyond that point in time. (Doc. 35-1 at 16–17). Medpace, however, maintains that the Task Order remained in effect until November 24, 2015 when it sent its Notice of Termination because InspireMD had failed to make the multiple quarterly payments. (Doc. 46 at 18–21).

Determining when the contractual relationship between the parties ended is a question of law. *See, e.g.*, *Stonehenge Land Co. v. Beazer Homes Invs., LLC*, 893 N.E.2d 855, 863 (Ohio Ct. App. 2008); *Gollihue v. Nat'l City Bank*, 969 N.E.2d 1233, 1238 (Ohio Ct. App. 2011); *Daniel E. Terreri & Sons v. Bd. of Mahoning Cty. Comm'rs*, 786 N.E.2d 921, 932 (Ohio Ct. App. 2003).

### 1.  InspireMD did Not Terminate the Task Order in September 2014.

InspireMD argues that its letter, dated September 23, 2014, is a "clear and unambiguous" notice of termination. (Doc. 35-1 at 16). The Court is not persuaded.

InspireMD's September 2014 letter did not constitute valid termination. The MSA's notice of termination provision is unambiguous. Under Section (6)(B), InspireMD was required to give Medpace 60 days' notice of termination. (Doc. 20-1 at 7). Section (7) mandates that any such notice must be in writing and is "effective upon receipt" by August J.

Troendle, Medpace's President and CEO at the Cincinnati, Ohio address provided in the MSA. (Doc. 20-1 at 8; *see id.* at 7).

Here, InspireMD's letter does not comply with any of the termination requirements. First, and most importantly, nothing in the letter even remotely suggests InspireMD intended to terminate the Task Order or the MSA. In the letter, InspireMD simply asks Medpace personnel to "please keep [clinical trial] activity to a minimum" and specifies certain services that should continue and others that should be "ceased or halted." (Doc. 26-4 at 2). The letter unequivocally speaks for itself. Instead of evidencing an intent to terminate the parties' relationship, the letter indicates a continuing engagement.

Second, the letter was not sent to August J. Troendle, as required by the MSA. Instead, the letter was sent to Deborah Schmalz. This is in all likelihood because it was not a "termination notice. But rather, as the letter states, it was "in follow-up" to a recent "conversation." *Id.*

Finally, the letter was sent to the wrong location. The letter is addressed to Schmalz in Blaine, Minnesota, not the Cincinnati, Ohio address plainly set forth in the MSA. As such, InspireMD's September 2014 letter is no different from any of the numerous other communications between the parties' agents discussing the progress of the clinical trials. Moreover, the fact that InspireMD made another quarterly payment—over two months after sending its purported "termination" letter—dispels any doubt that InspireMD never terminated the Task Order in September 2014. (Doc. 26, ¶ 71; Doc. 35-1 at 7). Thus, there is not even "evidence of constructive or actual notice" to cure the fatal defects in InspireMD's

*Medpace, Inc. v. InspireMD, Inc.*

13

2014 letter. *Gollihue*, 969 N.E.2d at 1239 (citing *Daniel E. Terreri & Sons, Inc*, 786 N.E.2d at 932.

This result is not altered by the declaration of Jonathan Pressment, counsel for InspireMD. (Doc. 35-2). "An affidavit or declaration used to support or oppose a motion for summary judgment must be made on personal knowledge. If the affiant or declarant could not have perceived or observed what he or she testified to, he or she could not have personal knowledge." 11 James W. Moore et al., MOORE'S FEDERAL PRACTICE § 56.94(b) (Matthew Bender 3d ed. 2018) (emphasis added) [hereinafter "MOORE'S"] (citing Fed. R. Civ. P. 56(c)(4) and Fed. R. Evid. 602). The "personal knowledge" requirement is not satisfied by merely stating that a statement is made "to the best of [the affiant's or declarant's] knowledge" or on "information and belief" or based upon the declarant's "personal awareness." *Id.*

Here, InspireMD's counsel was neither the drafter nor the sender of the September 2014 letter and is retained merely as outside counsel. Put differently, the statement by InspireMD's counsel in the declaration characterizing the September 2014 letter as a "Termination Notice" is merely "based upon belief." *See, e.g.*, *id.*; *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 667 (6th Cir. 2005) (district court improperly considered attorney's declaration to extent it was not based on personal knowledge); (Doc. 35-1, ¶ 7). Therefore, the Court will not consider counsel's statement.

The Court, however, will consider the discovery materials attached to the declaration. *Brainard*, 432 F.3d at 667. "Under the current version of Rule 56, a litigant may support or oppose a motion for summary judgment by citing to materials in the record. . . [E]vidence

submitted in support of or opposition to summary judgment need not be authenticated." 11 MOORE'S § 66.92(3); Fed. R. Civ. P. 56(c)(2); *see id.* advisory committee' note to 2010 amendment; *Ganesh v. United States*, 658 F. App'x 217, 220 (6th Cir. 2016). Accordingly, Jonathan Pressment's declaration (with the exception of paragraph 7) and the attached documents constitute evidence that may—and will —be considered as evidence that is part of the record. *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015).

In sum, InspireMD's September 2014 letter is not a termination notice because the letter does not evidence InspireMD's intent to terminate the Task Order, and the purported termination notice was not properly sent to Medpace's authorized representative. As such, the letter did not affect the parties' contractual relationship.

### 2.     Medpace Terminated the Contract in November 2015.

Medpace, on the other hand, substantially complied with the termination requirements and thereby terminated the Task Order on November 24, 2015.

Section (6)(C) of the MSA requires Medpace to give InspireMD written notice of a payment default and 15 days in which to cure the breach before terminating the Task Order. (Doc. 20-1 at 7). Under Section (7), the Task Order is considered terminated when InspireMd receives Medpace's termination notice. *See id.* at 8.

Unlike InspireMD's September 2014 letter, Medpace's intent to terminate the Task Order is clear from the face of its Notice of Termination. Medpace's Notice of Termination, dated November 24, 2015, clearly states that it is a "Notice of Termination of Task Order." (Doc. 20-2 at 1). The letter was also sent to InspireMD's designated representative, Craig

*Medpace, Inc. v. InspireMD, Inc.*

Shore, in Tel Aviv, Israel, as required by the plain terms of the MSA. *Id.*; (Doc. 20-1 at 8). Further, Medpace included an itemization of the services and expenses for which it avers InspireMD is responsible. Thus, as of November 24, 2015, the Task Order was terminated.

However, Medpace did not scrupulously adhere to every term of the termination provision in the MSA. Medpace neglected to provide InspireMD with notice of default and 15 days in which to cure before sending its Notice of Termination. (Doc. 20-1 at 7). But unlike InspireMD's 2014 letter, here, Medpace's error is harmless because there is evidence of "constructive or actual notice" to terminate the Task Order. *See, e.g.*, *Gollihue*, 969 N.E.2d at 1239 (citing *Daniel E. Terreri & Sons, Inc.*, 786 N.E.2d at 932). Specifically, Medpace sent InspireMD the four quarterly invoices. InspireMD was thereby constructively on notice that it was in default when it failed to make a payment for nearly a year and that as a result, Medpace could terminate the Task Order.

Thus, Medpace's failure to provide notice and an opportunity to cure does not vitiate the effectiveness of Medpace's termination or preclude recovery. *See, e.g.*, *Triangle Props. v. Homewood Corp.*, 3 N.E.3d 241, 257–58 (Ohio Ct. App. 2003). As a matter of Ohio law:

> The long and uniformly settled rule as to contracts requires only a substantial performance in order to recover upon such contract. Merely nominal, trifling, or technical departures are not sufficient to breach the contract . . . For the doctrine of substantial performance to apply, the part unperformed must not destroy the value or purpose of the contract.

*Stonehenge Land Co. v. Beazer Homes Invs., LLC*, 893 N.E.2d 855, 863 (Ohio Ct. App. 2008) (citation omitted); *Go Travel Toledo, Inc. v. Am. Airlines*, 96 F. App'x 290, 292 (6th Cir. 2004).

Here, Medpace sent its Notice of termination six days *before* the tenth and final

quarterly payment was due—*after* InspireMD had already defaulted on three quarterly payments. (Doc. 20-2; Doc. 20-1 at 28). Although Medpace failed to provide InspireMD with an opportunity to cure beforehand, this is merely a "nominal, trifling, or technical departure[]" that hardly "destroy[s] the value or purpose of the contract." *Stonehenge Land Co.*, 893 N.E.2d at 863. As such, the Court will not hold Medpace to a standard of strict compliance with the MSA's opportunity-to-cure requirement.

Accordingly, Medpace is entitled to damages for "all services rendered" and "*any non-cancelable expenses incurred* in connection with [Medpace]'s performance of Services" up to and until November 24, 2015. (Doc. 20-1 at 7).

### C. Measure of Damages

The only issue remaining is to determine the appropriate measure of damages owed by InspireMD under the terms of the MSA and Task Order. The parties have widely divergent views on this matter. Medpace claims InspireMD owes $1,964,822. (Doc. 20, ¶ 38). InspireMD contends that, at most, Medpace is entitled to $468,586, the total amount of the four outstanding quarterly invoices. (Doc. 35-1 at 18–19). Therefore, the question is whether Medpace is entitled to anything more than the four outstanding quarterly payments (quarterly payments 7–10 in the Payment Schedule, (Doc. 20-1 at 28)), which InspireMD admittedly has yet to tender, (Doc. 26, ¶¶ 25, 32); *cf.* (Doc. 20, ¶ 25).

The Court concludes that Medpace would be entitled to the four outstanding quarterly payments ($468,586) and non-cancelable expenses actually incurred, which—at most—total $2,285. To reach this determination, it is helpful to first determine the total

amount Medpace could hope to realize under the parties' agreement, and then calculate Medpaces damages.

## 1. The Total Value of the Contract

Section (4) of the MSA details InspireMD's payment obligations. In particular, InspireMD has three payment obligations: (1) Service Fees; (2) Pass-Through Costs; and (3) Pre-funded Expenses. (Doc. 20-1 at 3–4). The total value of the parties' agreement is simply the sum of these three payment obligations. Before turning to the language of the contractual documents, it bears emphasis that the terms of the MSA control in the event of a conflict with the terms of the Task Order, unless the Task Order explicitly states otherwise. (Doc. 20-1 at 15).

The MSA states under Section (4)(A), that: "[InspireMD] agrees to pay MEDPACE for Services rendered pursuant to the Project Budget and Payment Schedules" included in the Task Order. (Doc. 20-1 at 3). The Payment Schedule lists 21 milestones with corresponding payment amounts ("Milestone Payments"). (Doc. 20-1 at 28). The Milestone Payments can only be interpreted as follows:

(1) a one-time payment "Upon Execution";

(2) ten unconditional "quarterly payments" due at the stated time;

(3) four separate payments that are each due upon Medpace enrolling a certain number of patients;

(4) four separate payments that are each due if and when Medpace completes the clinical trial for a certain number of patients;

*Medpace, Inc. v. InspireMD, Inc.*

(5) a one-time payment for the "Database Lock"; and

(6) a one-time payment for "Delivery of Final Study Report."

*Id.* The total of these payments is $3,347,035. This is significant because the Project Budget for Direct Fees (or Service Fees), not surprisingly, is also $3,347,035. Thus, where the MSA states InspireMD must pay Medpace "for Services rendered pursuant to the Project Budget and Payment Schedules," this means that **$3,347,035 is the maximum amount of Service Fees** that Medpace could potentially earn, provided that each Milestone is met. Indeed, Section (4)(A) states that Service Fees are "fixed costs unless the underlying assumptions change" (*e.g.*, trial duration, number of patients, services provided), and even then "such changes shall be documented in a Contract Amendment." (Doc. 20-1 at 3).[3] But here, Medpace has not produced any evidence of a Contract Amendment extending the Project Budget for Service Fees.

The logical conclusion that the Service Fees Medpace could possibly claim are "fixed" or capped at $3,347,035 is bolstered by the provision in the Task Order under the heading "Compensation," which provides that: "[InspireMD] shall pay to MEDPACE ***an amount equal to the Project Budget . . . which amount shall be payable pursuant to the Payment Schedule.***" *Id.* at 16 (emphasis added). **Therefore, if Medpace achieved each Milestone, it could claim no more than $3,347,035 in Service Fees.**

With respect to "Pass-Through Costs," Section (4)(B) of the MSA adds: "[InspireMD]

---

[3] Section (3), entitled "Contract Amendments," states that a Contract Amendment is not effective "unless and until it is signed by both parties." (Doc. 20-1 at 3).

agrees to reimburse MEDPACE for reasonable pass-through costs identified in the Task Order and incurred by MEDPACE in providing the Services in accordance with the relevant Task Order ("Pass-Through Costs")." (Doc. 20-1 at 3)*. Further, "the Pass-Through Costs shall be included in each respective Task Order's project budget as a good faith estimate." *Id.* at 4. The total for Pass-Through Costs according to the Project Budget is $292,941. *Id.* at 27. Before Medpace can exceed the budgeted amount for Pass-Through Costs, it must "notify [InspireMD] and seek approval for the excess expense amount before it is incurred." *Id.* at 4.

Here again, Medpace has adduced no evidence that InspireMD approved Pass-Through Costs in excess of that specified in the Project Budget. **Therefore, Medpace is limited to Pass-Through Costs of $292,941.**

Next, InspireMD's obligations regarding "Pre-funded Expenses." Section 4(C) of the MSA states that: "The parties will work to establish a process for payment of Pre-funded Expenses in the applicable Task Order which allows for timely payment of such funds to Pre-funded Vendors." (Doc. 20-1 at 4). To that end, the "Pre-funded Expenses will be included in each respective Task Order's project budget as a good faith estimate." (Doc. 20-1 at 4).[4] However, the Project Budget does not contain an estimate for Pre-funded Expenses. The only

---

[4] With regard to Pre-funded Expenses, Section (6)(C) of the MSA further states that:

> If it becomes apparent to Medpace during the performance of its duties under a Task Order that that amount estimated . . . will be exceeded, it will notify [InspireMD] and seek approval for the excess expense amount before it is incurred. . . [InspireMd] will be responsible for the payment of such excess Pre-funded expense only if it approved such excess expense.

(Doc. 20-1 at 4).

provision that sheds any light on what constitutes a Pre-funded Expense is on the last page of the Task Order, which states: "Pre-funded expenses may include, but are not limited to, investigator fees." (Doc. 20-1 at 30). Thus, "this is not a case where the contractual language is ambiguous, but rather a situation where the contractual language is silent." *Savedoff*, 524 F.3d at 768–69.

"Ohio law prohibits a court from creating a contract for the parties when their contract has failed to address a particular matter." *Id.* Instead, "[t]he parties to a contract are required to use good faith to fill the gap of a silent contract." *Id.* Nevertheless, "a contract must be construed in its entirety and in a manner that does not leave any phrase meaningless or surplusage." *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 363 (6th Cir. 2014) (internal quotation marks omitted). To fulfill that objective, there can only be one reasonable interpretation that does not render the payment provisions, Payment Schedule, and Project Budget meaningless: The "Pre-funded Expenses" are, in fact, already included in the "Task Order's project budget as a good faith estimate." (Doc. 20-1 at 4). The covenant of "good faith" simply "does not permit a party to shoehorn into an [agreement] additional terms [the party] now wish[es] had been included." *Fifth Third Mortg. Co. v. Chi. Title Ins. Co.*, 692 F.3d 507, 512 (6th Cir. 2012) (citation and internal quotation marks omitted) (applying Ohio law).

Therefore, based on the unambiguous terms of the MSA and Task order, the total Service Fees (Direct Fees) plus the total Pass-Through Costs, yields the total value of the parties' agreement. **Accordingly, $3,639,976 is the most that Medpace could hope to see come to fruition during the parties' engagement.**

*Medpace, Inc. v. InspireMD, Inc.*

## 2.    Medpace's Damages

The unambiguous language of Section (6)(E) of the MSA instructs that "[i]n the event of any termination of a Task Order before completion," InspireMD is obligated to pay Medpace for: "[1] *all services rendered* pursuant to the unfinished Task Order *prior to such termination and* [2] *any non-cancelable expenses incurred* in connection with MEDPACE's performance of Services." (Doc. 20-1 at 7) (emphasis added). InspireMD leaves out the phrase "non-cancelable expenses" in arguing that damages should be limited to the four outstanding quarterly invoices. (Doc. 35-1 at 18–22). Thus, the appropriate measure of damages is services rendered plus non-cancelable expenses incurred, prior to when the Task Order was terminated. As concluded *supra*, the Task Order was terminated on November 24, 2015. Therefore, InspireMD is obligated to pay for services rendered and non-cancelable expenses actually incurred up to that point.

### a.    Damages for Services Rendered

"Services rendered," as discussed above, is calculated according to the Payment Schedule. Thus, Medpace is entitled to quarterly payments 1–10, regardless of whether or not Medpace enrolled or completed a certain number of patients. Medpace, however, is not entitled to the eight payments corresponding to patient enrollment and completion because these payments are contingent upon the number of patients enrolled or completed, (Doc. 20-1 at 28), and Medpace admitted in response to interrogatories that it never achieved the Milestones tied to patient enrollment and completion. (Doc. 35-11 at 6–7 (Interrog. No. 6)). Therefore, under the facts of this case, **the total Service Fees to which Medpace can claim**

**is the sum of the ten quarterly payments. That amount is $2,046,714.** *See* (Doc. 20-1 at 28).

To be sure, InspireMD cannot minimize its payment obligations by relying on its September 2014 letter, which purports to unilaterally "freeze" Medpace's ability to perform certain services. (Doc. 26-4). This is because the fees are "fixed." (Doc. 20-1 at 3, 16). Pursuant to Section (4)(A) of the MSA, the fees can be altered only if certain factors change, such as "trial duration, number of patients, and *services provided by Medpace*," and "[a]ll such changes" must "be documented in a Contract Amendment." (Doc. 20-1 at 3). Such an amendment under Section (3), must "written," "signed by both parties," and "detail the requested changes to the applicable task, responsibility, duty, budget, timeline or other matter." (Doc. 20-1 at 3). InspireMD readily admits that no contract amendment was ever executed. (Doc. 35-1 at 15); (Doc. 35-12 at 10 (request for production No. 24)). Thus, although InspireMD's September 2014 letter purports to set forth a change in certain services to be provided, Medpace was free to perform those services and InspireMD was in turn obligated to pay the "fixed fee" associated with the unconditional quarterly payments.

There is no dispute that InspireMD has only made quarterly payments 1–6. **Thus, Medspace would be entitled to the remaining four quarterly payments (7–10) under the Payment Schedule, the total of which is $468,586**. (Doc. 20-1 at 28).[5] Therefore, Medpace cannot recover the nearly $1.5 million in additional Service Fees it claims it is owed.

---

[5] The Court will not prorate quarterly payment 10. Only substantial performance is required, and here, Medpace terminated the Task Order just six days before that payment was due.

### b.      Damages for Non-Cancelable Expenses

Next, the non-cancelable expenses owed by InspireMD. The term "non-cancelable expenses" is not defined. "Undefined terms in a contract are interpreted using the plain, ordinary meaning of the words." *Daniel E. Terreri & Sons, Inc.*, 786 N.E.2d at 928 (citing *Nationwide Mut. Fire Ins. Co.*, 652 N.E.2d at 686); *Sunoco, Inc.*, 953 N.E.2d at 292. "The Ohio Supreme Court has consistently used dictionary definitions to determine the common meaning of a word." *Eclipse Res. - Ohio, LLC v. Madzia*, 717 F. App'x 586, 594 (6th Cir. 2017) (citing *Campus Bus. Serv. v. Zaino*, 786 N.E.2d 889, 891 (Ohio 2003).[6] However, courts "do not give words their ordinary meaning if 'some other meaning is clearly evidenced from the face or overall contents of the agreement.'" *Lockheed Martin Corp.*, 529 F. App'x at 703 (quoting *Sunoco, Inc.*, 953 N.E.2d at 293).

Here, the meaning of non-cancelable expenses is supplied by the overall contents of the Project Budget, Payment Schedule, and the payment provisions in both the MSA and Task Order. Section (6)(A)–(C) of the MSA states that the Service Fees, Pass-Through Costs, and Pre-Funded Expenses were intended to be included in the Project Budget and that any amount in excess of that stated in the Project Budget required either a Contract Amendment or InspireMD's approval. (Doc. 20-1 at 3–4). The parties clearly intended to provide a limited and well-delineated list of expenses in the Project Budget. As discussed, the expenses under

---

[6] The dictionary defines "noncancelable" simply as "not cancelable." *Noncancelable*, MERIAM-WEBSTER, https://www.merriam-webster.com/dictionary/noncancelable (last visited Feb. 20, 2019).

the column heading "Direct Fees," corresponds to twenty-one (21) Milestone Payments in the Payment Schedule. The only Project Budget amount not accounted for in the Payment Schedule is the Pass-Through Costs of $292,941. The Task Order explains that Pass-Through Costs "may include, but are not limited to project-specific printing, shipping, copying and binding costs, telecommunication and data costs, travel costs, . . . literature search and article retrieval costs, translation costs, and/ pharmacy fees." (Doc. 20-1 at 29). Costs such as these are inherently "non-cancelable." Moreover, Section (4)(B) states that InspireMD was required to "reimburse" Medpace for these costs, regardless of whether the Task Order was ever terminated. (Doc. 20-1 at 3). It follows then that **the "non-cancelable expenses" are, in fact, the "Pass-Through Costs."** The only alternative interpretation is that "non-cancelable expenses" can be determined ad hoc in the event that the Task Order is terminated. But this interpretation would render the provisions requiring a Contract Amendment or notice and approval to exceed the Project Budget, essentially meaningless. *Coma Ins. Agency v. Safeco Ins. Co.*, 526 F. App'x 465 (6th Cir. 2013) (citation and internal quotation marks omitted) ("[W]here two interpretations can be given to a term in a contract, [but ] one will make a provision meaningless, and one. . .will give full force to all provisions, the latter must be adopted.").

Moreover, this interpretation would inevitably permit a party to achieve minimal Milestones under the contract and terminate the Task Order just before the end of the contract term and then lay claim to substantially more in payments than it otherwise would be able to recover. Principles of contract interpretation prohibit this Court from sanctioning

such "manifest absurdity." *Sunoco, Inc.*, 953 N.E.2d at 292–93; *Lockheed Martin Corp.*, 529 F. App'x at 703.

Therefore, Medpace cannot be entitled to any more than $292,941 in non-cancelable expenses. Medpace, however, admits that its computation of damages is reflected in the itemized accounting attached to its Notice of Termination letter, (Doc. 46-7). (Doc. 35-10 at 4). That accounting summary states that Medpace has incurred $242,419 in Pass-Through Costs, of which InspireMD has paid $240,143. **Therefore, in the end, Medpace may recover no more than $2,285 in damages for non-cancelable expenses.**

Whether Medpace actually incurred the non-cancelable expenses is a question that the parties should address following receipt of this Opinion.

Refer to the tables in the attached Appendix, detailing the calculation of damages in accordance with this Opinion in light of the Project Budget (Doc. 20-1 at 26), Payment Schedule, *id.* at 28, and the itemized accounting of expenses and payments attached to Medpace's Notice of Termination (Doc. 46-7 at 2).

## IV.     CONCLUSION

Consistent with the accompanying Memorandum Opinion, and the Court being advised,

**IT IS ORDERED** that the parties proceed to mediation and file a status report on or before May 31, 2019, advising the Court of the status of this matter.

*Medpace, Inc. v. InspireMD, Inc.*

This 8th day of March 2019.



Signed By:
*William O. Bertelsman* WOB
United States District Judge

**APPENDIX**

| CORRECTED ITEMIZED ACCOUNTING OF SERVICES PERFORMED | | |
|---|---|---|

*The following table includes a comparison between Medpace's itemized accounting of service fees in its Notice of Termination (Doc. 46-7) and the Project Budget (Doc. 20-1 at 26) detailing the allowable expenses. The Direct Fee column is the amount listed in Medpace's itemized accounting of Services. Several of Medpace's claimed expenses exceed the Project Budget. Note that the total amount for Start-up and Interactive Voice Services was miscalculated in Medpace's Notice and has been corrected herein.

| Service Category | Direct Fee | Project Bdgt Amt. |
|---|---|---|
| **Start-up Services** | **$ 719,069** | **$ 218,382** |
| CRF Review (Includes Development of Annotated CRF) | $ 61,819 | $ 9,464 |
| Kick-Off Meeting | $ 7,065 | $ 6,551 |
| Project Specific Training | $ 39,285 | $ 14,123 |
| Investigator and Vendor Contract Negotiations | $ 186,726 | $ 61,172 |
| Site Selection/Feasibility | | |
| Investigator File Set-Up | $ 424,174 | $ 113,271 |
| Initial Essential Document Collection | | |
| **Meetings** | **$ 208,236** | **$ 66,651** |
| Conference Calls | $ 162,104 | $ 50,295 |
| Sponsor Meetings | $ 46,132 | $ 16,356 |
| **Interactive Voice/Web Response System (IVRS/IWRS)** | **$ 127,621** | **$ 140,643** |
| IVRS Development | $ 76,338 | $ 56,496 |
| System Utilization and Hosting | $ 24,413 | $ 24,413 |
| IVRS Maintenance and Help Desk | $ 26,870 | $ 59,735 |
| **Project Budget Management (PM) (U.S. only)** | **$ 987,587** | **$ 721,192** |
| Study Management (incl. oversight of EU CRO) | $ 966,080 | $ 699,934 |
| Ongoing Essential Document Collection | $ 21,507 | $ 21,257 |
| **Medpace incl. cost of Final Report in PM | | $ 18,008 |
| **Clinical Safety** | **$ 363,532** | **$ 339,198** |
| Safety Plan Development | $ 6,010 | $ 8,621 |
| SAE Reporting (Incl. initial report from site, draft of narrative, medical review, generation of regulatory reporting form, correspondence and SAE query resolution with site, and sponsor notification) | $ 350,056 | $ 317,579 |
| Annual Safety Reports | | |
| Safety Management | $ 7,466 | $ 12,998 |

*Medpace, Inc. v. InspireMD, Inc.*

| | | |
|---|---|---|
| **Clinical Monitoring (U.S. only)** | **$ 576,478** | **$ 1,025,846** |
| Monitoring Plan | $ 10,725 | $ 16,854 |
| Qualification Visits | $ 71,329 | $ 69,175 |
| Study Initiation Visits | $ 112,479 | $ 84,213 |
| Routine Monitoring | $ 381,945 | $ 855,604 |
| **Data Management** | **$ 558,245** | **$ 800,052** |
| Data Management Manual | | |
| Data Entry System Development (Incl. database development and all associated validation, including EDC User Acceptance Testing, data entry screen set-up, and edit check programming) | $ 121,533 | $ 52,347 |
| Database Transfers | | |
| Data Cleaning (Incl. edit review, query generation and tracking, label integration, and coding medications and AEs.) | $ 296,913 | $ 629,953 |
| EDC Help Desk | | |
| DM Coordination and Status Reports | $ 46,414 | $ 17,075 |
| System Utilization and Hosting | $ 93,385 | $ 100,677 |
| **Medical Writing** | **Incl. in PM** | **$ 35,071** |
| Final Report | Incl. in PM | $ 18,008 |
| ******TOTAL DIRECT FEES**** | **$ 3,540,768** | **$ 3,347,035** |
| | | |
| **Pass-Through Services** | **PT Fee** | **Project Bdgt. Amt.** |
| **Pass-Through Costs** | **$ 242,419** | **$ 292,941** |
| Meeting Travel | $ 27,299 | $ 21,831 |
| Central IRB Expenses | $ 86,640 | *Not in Bdgt. |
| Monitoring Travel | $ 45,153 | $ 202,933 |
| Communication Expenses | $ 562 | $ 12,929 |
| Misc. Printing, Copying, Shipping Expenses | $ 22,767 | $ 54,582 |
| Translation Expenses | $ 59,998 | *Not in Bdgt. |
| ******TOTAL PASS-THROUGH SERVICES**** | **$ 242,419** | **$ 292,941** |

| | |
|---|---|
| **ACCOUNTING SUMMARY (per Medpace's Notice of Termination)** | |
| Service (Direct) Fees Performed to Date: | **$ 3,540,768** |
| Pass-Through Expenses to Date: | **$ 242,419** |

*Medpace, Inc. v. InspireMD, Inc.*

| | |
|---|---|
| Service (Direct) Fees Paid to Date: | **$ 1,578,128** |
| Pass-Through Fees Paid to Date: | **$ 240,134** |
| **Amount Due Per Notice of Termination:** | **$ 1,964,925** |

**QUARTERLY PAYMENTS** (Doc. 20-1 at 28)

| **Total Service Fee Payments to Date** | | **Total Service Payments Owed to Date** | |
|---|---|---|---|
| Execution Payment | $ 502,055 | Quarterly Payment 7 | $ 150,617 |
| Quarterly Payment 1 | $ 286,172 | Quarterly Payment 8 | $ 150,617 |
| Quarterly Payment 2 | $ 137,228 | Quarterly Payment 9 | $ 100,411 |
| Quarterly Payment 3 | $ 200,822 | Quarterly Payment 10 | $ 66,941 |
| Quarterly Payment 4 | $ 150,617 | **Total:** | **$ 468,586** |
| Quarterly Payment 5 | $ 150,617 | | |
| Quarterly Payment 6 | $ 150,617 | *See* (Doc. 20-1 at 28) | |
| **Total:** | $ 1,578,128 | **Total Value of Quarterlies:** | **$ 2,046,714** |

| | |
|---|---|
| **Total Value of the Contract:** | **$ 3,639,976** |

| MEDPACE'S POSSIBLE DAMAGES AWARD | | |
|---|---|---|
| **Four Quarterly Payments:** | | $ 468,586 |
| Pass-Through Expenses to Date: | $ 242,419 | |
| Pass-Through Fees Paid to Date: | $ 240,134 | |
| **Non-Cancelable Expenses (i.e., Pass-Through Fees):** | | $ 2,285 |
| **Total Possible Judgment:** | | **$ 470,871.00** |

*Medpace, Inc. v. InspireMD, Inc.*